2008 VT 129

# Delta Psi Fraternity v. City of Burlington

[969 A.2d 54]

No. 07-386

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed October 10, 2008

*Heather R. Hammond* of *Gravel and Shea,* Burlington, for Plaintiff-Appellee.

*Eugene M. Bergman,* Office of the City Attorney & Corporation Counsel, Burlington, for Defendant-Appellant.

¶ 1. **Skoglund, J.** The City of Burlington appeals the trial court's summary judgment order granting Delta Psi Fraternity tax-exempt status on its uninhabited residential property. The City contends that the trial court erred as a matter of law in ruling that the tax exemption is based solely on the building's ownership and not its use. We reverse.

¶ 2. The relevant facts are uncontroverted. Organized in 1850 and incorporated in 1884 "for the purpose of promoting useful knowledge, [and] intellectual, social, and aesthetic culture," Delta Psi existed as a fraternity at the University of Vermont (UVM) for more than 150 years. From 1924 until January 2004, Delta Psi housed its members at a residence on Summit Street that is the subject of this litigation. Delta Psi is a "local fraternity" with no national affiliation and had a membership comprising both students and alumni. Eventually, both Delta Psi and its residence began a slide into neglect. By 2003, active student membership in Delta Psi had dwindled to five members, the organization was in financial trouble, and the UVM administration had suspended the fraternity for a hazing incident. In December 2003, the house's heating system failed, causing the water pipes to freeze. The fire

department and city inspectors, responding to an alarm, discovered standing water, smashed doors and walls, woodwork torn apart, and paths of egress obstructed with debris. Given the condition of the property, the City declared the residence uninhabitable and evicted the few remaining members. UVM then classified the fraternity as "inactive."

¶ 3. Since January 2004, no students have lived at the residence, and the fraternity has remained inactive. Delta Psi's board made a consistent — yet ultimately unsuccessful — effort to raise the substantial funds needed to rehabilitate the house and reorganize the fraternity. After making some basic repairs, the board secured a caretaker to live in the residence rent-free in exchange for providing routine maintenance and in order to prevent vandalism. In June 2006, a second caretaker replaced the first and remained on the property for the remainder of the relevant time period. Between June 2004 and December 2006, alumni members of the fraternity held six administrative meetings in the building and used it for one fundraising "phone-a-thon." In 2005, the City assessor informed Delta Psi that since the fraternity was no longer "recognized"[1] by UVM and did not house UVM students, the property was no longer tax-exempt.

¶ 4. In reaction to the City's determination, Delta Psi sought a declaratory judgment that the property was tax-exempt under 32 V.S.A. § 3802(5), a provision that exempts certain property owned by fraternities unless held for investment purposes. Delta Psi moved for summary judgment, and the City filed a cross-motion for summary judgment. The trial court granted Delta Psi's motion, ruling that the property was tax-exempt because "the fraternity house exemption is based on ownership of the house and the land that it occupies, not its use." This appeal followed.

¶ 5. We review grants of summary judgment de novo, using the same standard applied by the trial court. *Openaire, Inc. v. L.K. Rossi Corp.*, 2007 VT 120, ¶ 7, 182 Vt. 636, 940 A.2d 724 (mem.). To withstand a challenge to summary judgment, the moving party must prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 28, 742 A.2d 734,

---

[1] We note that the City's letter was not fully accurate, as UVM continued to recognize Delta Psi as an "inactive" fraternity, but this error is immaterial to our analysis and result.

132

736 (1999); V.R.C.P. 56(c)(3). As this case presents no dispute of material facts, our review is strictly limited to deciding whether § 3802(5) grants tax exemptions to residential fraternity properties regardless of their current use. We conclude that the statute requires use of the fraternity property as a residence for student members. As Delta Psi's property was not being used as such for the relevant time period, it is not exempt from property tax for the corresponding tax years.

¶ 6. We look first to the text of the statute. Section 3802(5) exempts from taxation:

> Real and personal property held by and for the benefit of college fraternities and societies and corporations owning such property, but this exemption shall not apply to property held for investment purposes. The exemption from taxation of real and personal property held by and for the benefit of college fraternities and societies and corporations owning such property *shall not be construed as exempting lands, buildings or property other than a fraternity or society house*, the land occupied thereby, the land adjacent thereto and used as a lawn, playground or garden, and the household furniture, and equipment in actual use in such fraternity or society house.

32 V.S.A. § 3802(5) (emphasis added).

¶ 7. When interpreting statutes, "[t]he bedrock rule of statutory construction is to determine and give effect to the intent of the Legislature." *In re C.S.*, 158 Vt. 339, 343, 609 A.2d 641, 643 (1992); see also *Wesco, Inc. v. Sorrell*, 2004 VT 102, ¶ 14, 177 Vt. 287, 865 A.2d 350 ("Our primary objective in construing a statute is to effectuate the Legislature's intent."). We effectuate this intent by first "examin[ing] the plain meaning of the language used in light of the statute's legislative purpose . . . . If that plain language resolves the conflict without doing violence to the legislative scheme, there is no need to go further . . . ." *Lubinsky v. Fair Haven Zoning Bd.*, 148 Vt. 47, 49, 527 A.2d 227, 228 (1986). But "if the literal meaning of the words is inconsistent with [legislative] intent, the intent must prevail." *Inst. of Prof'l Practice, Inc. v. Town of Berlin*, 174 Vt. 535, 536, 811 A.2d 1238, 1240 (2002) (mem.). Such inconsistency occurs if applying the "precise wording" of a statute produces "results which are manifestly unjust, absurd, unreasonable or unintended, or conflicts with

other expressions of legislative intent." *Town School Dist. of St. Johnsbury v. Town School Dist. of Topsham*, 122 Vt. 268, 271, 169 A.2d 352, 354 (1961). The legislative "intent is most truly derived from a consideration of not only the particular statutory language, but from the entire enactment, its reason, purpose and consequences." *Lubinsky*, 148 Vt. at 50, 527 A.2d at 228; see also *In re Carroll*, 2007 VT 19, ¶ 9, 181 Vt. 383, 925 A.2d 990 (noting that we determine legislative intent by considering "the whole statute, the subject matter, its effects and consequences, and the reason and spirit of the law"). Finally, "[w]here there are similar statutes in other jurisdictions, we are also guided by the interpretations of those statutes." *Human Rights Comm'n v. Benevolent & Protective Order of Elks*, 2003 VT 104, ¶ 13, 176 Vt. 125, 839 A.2d 576.

 ¶ 8. Nothing in the statute expressly requires that a fraternity house be used as a student residence in order to qualify for the exemption. However, the term "fraternity house," which is not defined by statute, could nevertheless be construed to impose a residential use requirement; many common definitions of "house" imply use as a residence. Black's Law Dictionary defines "house" as a "home, dwelling, or residence." Black's Law Dictionary 756 (8th ed. 2004). Webster's Dictionary defines "house" first as a "structure intended or used for human habitation." Webster's New International Dictionary of the English Language 1207 (2d ed. 1961). On the other hand, "the term *house* is generally interpreted in accordance with [its] context." *Id.* Thus, there are numerous nondwelling-place definitions of "house." See, e.g., Black's Law Dictionary, *supra*, at 756 (defining house as "[a] branch of a legislature"); Webster's, *supra*, at 1207 ("[a] religious fraternity . . . [a] college in a university . . . [a] theatre or playhouse"). This definitional variety makes it unclear whether the "fraternity house" language requires use as a residence. Given that our primary objective is to give effect to legislative intent, however, neither the lack of statutory language explicitly requiring use nor the ambiguity of "fraternity house" controls the question presented in this case. We conclude that it was the Legislature's intent to limit the tax exemption to fraternity-owned property used for the public purpose of housing students.

¶ 9. As a threshold matter, the legislative history giving rise to § 3802(5) suggests that the exemption is intended to be a limited one. In 1906, the Legislature first freed all fraternity-owned property from the tax rolls, except property owned for investment

purposes. 1906, No. 27, § 1. In 1939, the Legislature restricted the fraternity exemption to the language still in effect today by limiting it to the "fraternity . . . house" and the surrounding "lawn, playground or garden." 1939, No. 12, § 1 (codified at 32 V.S.A. § 3802(5)). Finally, in 1941, the Legislature further limited the exemptions for fraternities by making any property bought after 1941 taxable at the assessed value of the last assessment date prior to the purchase, provided that the municipality's voters do not vote to grant an exemption. 1941, No. 12, § 1 (codified as amended at 32 V.S.A. § 3831(a)). While this last act has no bearing on Delta Psi's situation, as it acquired the house in 1924, it illustrates the increasing restrictions the Legislature has placed on fraternity tax exemptions.

¶ 10. Moreover, the history of § 3802(5) and its predecessor statutes — especially when viewed in the context of the history of Vermont fraternities generally — shows that the Legislature has always intended the exemption as a means to subsidize student housing.

¶ 11. The earliest American fraternities appeared in the nineteenth century as a response to tight restrictions on academic and social freedoms in colleges. M. Bauer, *Small Liberal Arts Colleges, Fraternities, and Antitrust: Rethinking Hamilton College*, 53 Cath. U. L. Rev. 347, 352 (2004). The first fraternity at UVM, Lamda Iota, formed in 1836 as a "smoking club" to protest the university's ban on tobacco. T. Bassett, *The Classical College, 1833-1895: Growth and Stability: Overview*, in *The University of Vermont: The First Two Hundred Years* 79, 83 (R. Daniels ed. 1991) [hereinafter *Two Hundred Years*]. The second and third UVM fraternities were formed shortly thereafter; Sigma Phi was chartered in 1845 and Delta Psi in 1850. *Id.* Throughout the rest of the nineteenth century, these fraternities met on campus or in downtown Burlington. *Id.* It was not until the turn of the century that it became commonplace for college fraternities to own or rent houses for their members. O. Partridge, *The Legal Status of a College Fraternity Chapter*, 42 Am. L. Rev. 168, 180 (1908).

¶ 12. UVM was not a residential college in the modern sense until 1895, when it built one dorm with a ninety-man capacity and purchased a private residence to house twenty women. V. Downs, *UVM Goes Modern: Student Life in the Collegiate Era*, in *Two Hundred Years, supra*, at 234, 235. Nevertheless, by 1900 the school could house only half of its student body on campus. *Id.*

This created a demand for housing that the fraternities and sororities helped to fill. Sigma Phi acquired the first UVM fraternity house in 1902, *id.*, and Delta Psi followed suit in 1903. *Delta Psi Fraternity: University of Vermont* 12 (E. Worthen, et al., eds. 1905).

¶ 13. The Vermont Legislature first exempted the real property of fraternities from taxation in 1906 — contemporaneously with the first acquisition by fraternities of residences in which to house students. We find this persuasive evidence that by exempting fraternities from taxation the Legislature intended to assist UVM with the housing of students.[2] Nor are we the first court to arrive at this conclusion. The Supreme Court of Kansas long ago recognized that "the evident purpose of [its] Legislature" in exempting college societies from taxation was "to encourage the construction and use of dormitories so as to provide homes for the nonresident students at colleges and universities." *Kappa Kappa Gamma House Ass'n v. Pearcy*, 142 P. 294, 296 (Kan. 1914).

¶ 14. Our conclusion is consistent with our practice of construing tax exemptions strongly against those who claim the exemption, see *In re Ne. Washington County Cmty. Health Ctr.*, 148 Vt. 113, 115, 530 A.2d 558, 559 (1987), and with our preference for limiting tax exemptions to property used for some public benefit. We have recognized that "the right to hold land without being subject to taxation may constitute a substantial detriment to the affected locality and a significant advantage to the landowner" and that land use "ought not to result in exemption from taxation absent the conferral of a substantial public benefit such as the tax exemption law was designed to foster." *Governor Clinton Council, Inc. v. Koslowski*, 137 Vt. 240, 249, 403 A.2d 689, 695 (1979). Where requiring use for a public purpose under a tax-exemption

---

[2] Furthermore, we know that at least one legislator understood the 1906 bill exempting all fraternity property as an attempt to stimulate college housing. Claude Dewing Graton represented the City of Burlington in the Vermont House of Representatives in 1906, and criticized the fraternity exemption on the grounds that "[t]he housing or boarding of students is not of itself an educational process any more than is the housing or boarding of any other class of human beings." C. Graton, *All Laws Exempting Property From Taxation Other Than as Provided in This (United States) Constitution Shall Be Void (Proposed Amendment)*, 11 Me. L. Rev. 197, 198 (1918) (citation omitted). Graton apparently believed the tax exemption was created to stimulate student housing, but did not believe that this was a worthy pursuit.

statute is consistent with the legislative intent, this is the preferred construction. See *Berkshire Sch. v. Town of Reading*, 172 Vt. 440, 442, 781 A.2d 282, 283 (2001) ("[D]espite the language of § 3802(4), a use requirement is consistent with the legislative purpose of the exemption statute, which is to free from taxation land that is being used to serve some public purpose."). Indeed, these principles are what led us to infer a use requirement in the predecessor to adjoining educational tax exemption, § 3802(4), in *Willard v. Pike*:

> Although, under our statute, ownership is all that is expressly required, it is probable that the legislature did not intend to exempt property simply because owned by an academy. In construing statutes of exemption from taxation, regard must be had to the settled rule that they are to be construed most strongly against those who claim their benefit. The ownership must undoubtedly be, not for speculative purposes, but for the appropriate use and benefit of the institution as an academy or a college in carrying out the purposes of its incorporation.

59 Vt. 202, 218, 9 A. 907, 916 (1887). Inferring a use requirement is similarly appropriate here, for our construction of a statutory tax exemption must not "defeat the purposes of the statute." *Troy Conference Acad. v. Town of Poultney*, 115 Vt. 480, 486, 66 A.2d 2, 6 (1949).

¶ 15. Our reluctance to exempt fraternity property from taxation without regard to whether it is being put to *some* use, however defined, is generally consistent with the treatment of like exemptions in other states. Besides Vermont, only eight states exempt real property owned by college fraternities by statute. See Ala. Code § 40-9-16 (exempting "property of corporations or associations" furthering "the social or literary advancement of their members" and "used as an adjunct of or in connection with any college or university and approved by the governing body of said college or university"); Colo. Rev. Stat. Ann. § 39-3-111 (exempting property "owned and used solely and exclusively for strictly charitable purposes" by fraternal organizations, defined by § 12-9-102(6) as including college fraternities); Del. Code Ann. tit. 9, § 8106 (exempting "property owned and used" by college fraternities, with a $10,000 limit); Fla. Stat. § 196.198 (exempting "portions of property of college fraternities and sororities certified

by the president of the college or university . . . as being essential to the educational process"); N.D. Cent. Code § 57-02-08(11) (exempting "property owned by any fraternity, sorority, or organization of college students if such property is used exclusively for such purposes" as "[a] place[] of meeting [or] for conducting [its] business and ceremonies"); Nev. Rev. Stat. § 361.100 (exempting "real property owned by any fraternity or sorority . . . which is composed of students of the University of Nevada, Reno, or the University of Nevada, Las Vegas, and used as a home for its members"); W. Va. Code § 11-3-9(a)(15) (exempting "property owned by a fraternity or sorority organization affiliated with a university or college . . . when the property is used as residential accommodations, or as a dormitory, for members of the organization"); Wyo. Stat. Ann. § 39-11-105(a)(xxvi) (exempting property "used by . . . any fraternal organization officially recognized by the University of Wyoming or any community college"). All but Florida's exemption have an explicit use requirement, and even Florida's exemption is limited to those portions of fraternity property that the college president certifies as "essential to the educational process." Fla. Stat. § 196.198. Thus, our conclusion that the "fraternity house" language imposes a use requirement brings our exemption in line with those granted by other state statutes.

¶ 16. Moreover, our conclusion that the exemption requires a *residential* use not only flows naturally from the legislative history of § 3802(5), but is also consistent with what other states have reasoned are — and are not — the benefits of fraternities. In states that do not explicitly extend real-property exemptions to fraternities by statute, fraternities have sought property-tax exemptions under general exemptions for educational, literary, or charitable organizations. In a few cases, courts have granted these exemptions, reasoning that fraternities serve the general charitable purposes typically recited in their charters. See *Beta Theta Pi Corp. v. Bd. of Comm'rs*, 234 P. 354, 356 (Okla. 1925) (reasoning that fraternity served charitable purpose in part by "promot[ing] the educational, moral and social culture and benevolent welfare of [its] members"); *State ex rel. Daggy v. Allen*, 127 N.E. 145, 146 (Ind. 1920) ("[T]he allegations of the [fraternity's] pleading clearly show that the dominant purposes for which [its] building [was] used [were] literary and educational."). However, many more courts have reasoned that the essential purpose of a

fraternity house is residential, and have declined to extend general charitable-tax exemptions to real property owned by fraternities:

> Most courts which have dealt with the question have taken the view that the primary purpose of a college fraternity house is to furnish a private boarding place and dormitory for the use of the fraternity members, and accordingly have generally held that college fraternity houses are not exempt from taxation[] on the ground that they are beneficent and charitable organizations.

*Mu Beta Chapter Chi Omega House Corp. v. Davison*, 14 S.E.2d 744, 746 (Ga. 1941); see also *Inhabitants of Orono v. Sigma Alpha Epsilon Soc'y*, 74 A. 19, 21 (Me. 1909) ("The . . . purposes of the [fraternity house] are . . . . domestic, in the nature of a private boarding house."); *Phi Beta Epsilon Corp. v. City of Boston*, 65 N.E. 824, 824-25 (Mass. 1903) (fraternity house is used primarily for boarding students, not educational process); *Powers v. Harvey*, 103 A.2d 551, 555 (R.I. 1954) (fraternity housing is not exempt from taxation). The above cases demonstrate a general, if not unanimous, consensus that fraternity houses offer little benefit to the public beyond providing a residence for college students.

■ ¶ 17. Finally, we recognize that almost all of the exemptions under § 3802 explicitly require use of an exempted property for a specific purpose. See, e.g., *Am. Museum of Fly Fishing, Inc. v. Town of Manchester*, 151 Vt. 103, 108, 557 A.2d 900, 903 (1989) ("[I]n applying . . . § 3802(4) . . . the crucial factor is the primary use to which the property is put."). Other tax-exempt property under § 3802 includes property owned and used by veterans' organizations, 32 V.S.A. § 3802(2); churches and libraries, *id.* § 3802(4); Young Men's and Young Women's Christian Associations, *id.* § 3802(6); cemeteries, *id.* § 3802(7); agricultural fairgrounds, *id.* § 3802(9); fallout shelters, *id.* § 3802(13); and rural health clinics, *id.* § 3802(16). In fact, of the exemptions under § 3802 for private organizations, only fraternity-owned property, *id.* § 3802(5), property owned by animal-welfare organizations, *id.* § 3802(15), and property owned by educational institutions, *id.* § 3802(4), do not include explicit use requirements. In light of our reasoning above and the long-standing, implied use requirement of § 3802(4), the omission of an explicit use requirement in the exception is not controlling. See *Oxx v. Dep't of Taxes*, 159 Vt. 371, 375, 618 A.2d 1321, 1324 (1992) (noting that the maxim "expressio unius" is

"relatively weak"); *Clymer v. Webster*, 156 Vt. 614, 625, 596 A.2d 905, 912 (1991) (stating that the canon should "be applied with great caution" as it is "not conclusive as to the meaning of a statute" (quotation omitted)).

¶ 18. In this case, it is uncontroverted that for three years Delta Psi did not use its residential property to house students — nor could it have legally done so. Their empty, dilapidated building does not confer any public benefit, or justify any public subsidy. We do not here address the exact moment when a fraternity house ceases being used for residential purposes and becomes taxable. We recognize that there may be certain emergency circumstances that prevent habitation of a fraternity house on a truly temporary basis in which tax exemption may remain appropriate. Such is not the case here. When the building is uninhabited and uninhabitable by students, the fraternity inactive and without undergraduate members to house in the building, and the use of the structure is intermittent, purely administrative, and by nonstudents, § 3802(5) does not apply.

*Reversed.*